IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

ANTHONY G. GILL,

                              Plaintiff,

              v.                              Civil Action No.
                                              9:01-CV-0323 (FJS/DEP)

V. HOADLEY, *et al.*,

                              Defendants.

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

ANTHONY G. GILL, *pro se*

FOR DEFENDANTS:

HON. ELIOT SPITZER                        LISA ULLMAN, ESQ.
Attorney General of the State            Assistant Attorney General
 of New York
Office of Attorney General
615 Erie Blvd. West
Suite 102
Syracuse, NY 13204-2455

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Anthony G. Gill, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983 against various employees of the New York

State Department of Correctional Services ("DOCS"), alleging deprivation

of his civil rights.  A prolific litigant, Gill had by 2003 commenced at least

116 separate actions against the State of New York, its executive

agencies, and its officials and employees while incarcerated.  *See Gill v.*

*Pidlypchak*, No. 02-CV-1460, Dkt. No. 17, at 1, n. 1 (N.D.N.Y. Aug. 1,

2003).[1]  Over the years, plaintiff has been particularly vigilant in suing to

protect his right under the First Amendment to freely exercise his chosen

religion.  *See*, *e.g.*, *Gill v. Calescibetta*, No. 00 CV 1553 (N.D.N.Y., filed in

2003), *aff'd in relevant part,* 2005 WL 3309615 (2d Cir. Dec. 7, 2005)

(unpublished*); Gill v. DeFrank,* No. 98 Civ. 7851, 2000 WL 270854

(S.D.N.Y. Mar. 9, 2000), *adopted*, 2000 WL 897152 (S.D.N.Y. July 6,

2000), *aff'd*, 8 Fed. Appx. 35, 2001 WL 388057 (2d Cir. Apr. 16, 2001);

*Gill v. Tuttle*, No. 00-CV-585 (N.D.N.Y., filed 2000).

While plaintiff's complaint in this action originally involved a broader

array of conduct on the part of the various named defendants, his claims

have been winnowed as a result of an earlier decision from the court,

leaving only First Amendment free religious exercise claims against two

---

[1]     A recent search of one computerized database revealed eighteen
reported and unreported decisions involving cases in which Gill was a plaintiff.

defendants employed at the facility in which Gill was confined at the

relevant times, including Corrections Captain C. Gummerson and Deputy

Superintendent for Security John Burns.  Those remaining claims center

upon various requests by Gill for permission to attend religious services

while under keeplock cell confinement.[2]  Plaintiff asserts that the denials

of those requests, which were directed to defendant Burns but delegated

to defendant C. Gummerson, a corrections captain, deprived him of his

First Amendment right to freely exercise his chosen religion and were not

based upon legitimate penological concerns.

Currently pending before the court is a motion by the two remaining

defendants for dismissal of plaintiff's free exercise claims.  Plaintiff has

opposed that motion, and additionally seeks reinstatement of First

---

[2]      Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *Warburton v. Goord*, 14 F. Supp.2d 289, 293 (W.D.N.Y. 1998) (citing *Gittens*); *Tinsley v. Greene*, No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia*, *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)).  The conditions experienced under keeplock confinement are substantially the same as those applicable to inmates in the general population. *Wright v. Coughlin*, 26 F. Supp.2d 615, 628 (S.D.N.Y. 1998).  Inmates under such restriction are confined to general population cells for twenty-three hours a day, with one hour allotted for exercise; can leave their cells for showers, visits, medical exams and counseling; and can have cell study, as well as access to books and periodicals. *Id.*  The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

Amendment retaliation claims previously dismissed by the court.  For the

reasons set forth below, I recommend that both motions be granted.

I.      <u>BACKGROUND</u>

        At the times relevant to his claims plaintiff was a prison inmate

confined within the Auburn Correctional Facility ("Auburn"), and a

practicing Jehovah's Witness, having been baptized into that religion in

August of 1995.  *See* Amended Complaint (Dkt. No. 20) ¶ 1; Nepveu Decl.

(Dkt. No. 93) Exh. O, at 5.  Jehovah's Witnesses at Auburn meet on

Monday and Friday evenings for approximately two hours each night.

Nepveu Decl. (Dkt. No. 93) Exh. O, at 11-13.  Monday evening Jehovah's

Witness meetings focus upon Bible study, as well as either theocratic

ministry schooling or study of a separately printed book which includes

Bible excerpts and other materials.[3]  Nepveu Decl. (Dkt. No. 93) Exh. O,

at 12-13.  On Fridays, meeting participants engage in the study of

*Watchtower*, a Jehovah's Witness publication, followed by either Bible or

book study.  Nepveu Decl. (Dkt. No. 93) Exh. O, at 8, 14.  On occasion,

public talks are given during those meetings by elders or presiding

---

[3]      Theocratic ministry schooling trains Jehovah's Witnesses to approach
individuals in public regarding their religious beliefs.  Nepveu Decl. (Dkt. No. 93) Exh.
O, at 9.

overseers.  *Id.* at 10-11, 14.

While some congregate religious services at Auburn are held in the prison chapel, others, including Jehovah's Witness meetings, are conducted in a school building at the facility.  Gummerson Decl. (Dkt. No. 93) ¶ 29; Nepveu Decl. (Dkt. No. 93) Exh. O, at 13.  In the evenings there are generally between 100 and 150 inmates in the classrooms of that school building, the doors of which are not locked.  Gummerson Decl. (Dkt. No. 93) ¶ 31.  The building is patrolled by four security staff members, with a ratio of approximately one staff member for each six to eight classrooms.  *Id.*

Under established DOCS policy regarding such matters, an inmate on keeplock status may request permission to attend regularly scheduled congregate religious services by writing to the facility's deputy superintendent for security or his or her designee.  *See* DOCS Directive No. 4202 (reproduced at Nepveu Decl. (Dkt. No. 93) Exh. N, § J).  That policy statement provides, in pertinent part, that such a request

> must be submitted 48 hours before the time of the scheduled service unless the inmate has been placed in keeplock or confinement less than 48 hours before the service.  In such a case, the request must be submitted within 24 hours after the inmate has been placed in keeplock or

> confined.  A separate request must be submitted
> for each religious service that an inmate desires to
> attend.  The final decision to permit attendance
> rests with the Deputy Superintendent for Security.

*Id.*  Inmates, including those on confinement and unable to attend

congregate services, are permitted to keep Bibles and other religious

materials with them in their cells.  *See* Nepveu Decl. (Dkt. No. 93) Exh. O,

at 22.

The record before the court reveals that plaintiff was placed under

keeplock confinement on five separate occasions between January 19,

2001 and May 25, 2001.  Nepveu Decl. (Dkt. No. 93) Exhs. A-M.  During

those periods, plaintiff submitted several written requests for permission

to attend religious services.  The first of those was dated January 22,

2001, and requested permission to attend a service on Monday, January

29, 2001.[4]  Amended Complaint (Dkt. No. 20) Exh. D; Nepveu Decl. (Dkt.

No. 93) Exh. A.  That request was denied by defendant Gummerson on

January 25, 2001 in a writing which included the notation "chronic

disciplinary problems".  *See id.*  Gill next requested permission on January

---

[4]       That request was actually submitted during an earlier, ten day keeplock
confinement being served by the plaintiff.  Plaintiff was released in connection with that
keeplock confinement, but was again placed on cell restriction on January 29, 2001,
the date of the service which was the subject of that request.  *See* Amended Complaint
(Dkt. No. 20) at 4, n. 4.

29, 2001, while on keeplock restriction for refusing to obey a direct order and a count violation, *see* Nepveu Decl. (Dkt. No. 93) Exh. M, to attend a service scheduled for February 2, 2001.[5]  Amended Complaint (Dkt. No. 20) Exh. D; Nepveu Decl. (Dkt. No. 93) Exh. B.  That request was denied by defendant Gummerson on January 30, 2001, with a similar notation of "chronic disciplinary problems".  *Id.*

After once again being placed in keeplock confinement, plaintiff requested permission on April 13, 2001 and April 16, 2001 to attend services scheduled for April 13, 16, 20 and 23, 2001.[6,7,8]  Amended Complaint (Dkt. No. 20) Exh. G; Nepveu Decl. (Dkt. No. 93) Exhs. C-F.  There was no response by any of the defendants, including Corrections

---

[5]     On the date of that request Gill's keeplock confinement for refusing to obey an order and a count violation ended, and another for harassment of DOCS employees and making false statements began.  *See* Amended Complaint (Dkt. No. 20) Exh. B.

[6]     While there is no indication that those requests were ever received, *see* Gummerson Decl. (Dkt. No. 93) ¶¶ 11, 23, based upon the procedural posture of the case, and resolving all ambiguities and drawing all inferences in a light most favorable to the plaintiff, I assume that they were both received, and denied.  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

[7]     Defendants note that while he was in keeplock confinement between February 1, 2001 and February 16, 2001, Gill did not request permission to attend any religious services during this period.  Defendants' Memorandum (Dkt. No. 93) at 9.

[8]     In his amended complaint, plaintiff alleges that he served twenty-one days of keeplock confinement during April of 2001.  *See* Amended Complaint (Dkt. No. 20) ¶ 23.  Plaintiff's disciplinary history, however, fails to substantiate this claim.  Nepveu Decl. (Dkt. No. 93) Exh. M;

Captain Gummerson, to those requests.  Gummerson Decl. (Dkt. No. 93) ¶¶ 11, 23.  During that period of keeplock confinement written requests were also submitted by Gill on April 23, 2001 to attend services scheduled for April 27 and 30, 2001.  Amended Complaint (Dkt. No. 20) Exh. G; Nepveu Decl. (Dkt. No. 93) Exhs. G & H.  While the first of those requests was denied by defendant Gummerson with a notation "denied-chronic disciplinary problem", *see* Nepveu Decl. (Dkt. No. 93) Exh. G, the record does not indicate receipt by defendant Gummerson of the second.  *Id.* Exh. H; *see also* Gummerson Decl. (Dkt. No. 93) ¶ 23.

Plaintiff's keeplock confinement on May 4, 2001, based upon allegations of providing false information, creating a disturbance, and refusing to obey a direct order, led to his submission on May 7, 2001 of a request to attend Jehovah's Witness services on May 11 and 14, 2001.[9] Amended Complaint (Dkt. No. 20) Exh. L; Nepveu Decl. (Dkt. No. 93) Exhs. I & J.  Those requests were denied by defendant Gummerson, the first with a notation "chronic disciplinary problem – disruptive behavior" and the second simply referencing "disruptive behavior".  *Id.*  Requests submitted by Gill on May 14, 2001, seeking permission to attend services

---

[9]     Plaintiff apparently did not submit requests to attend services scheduled for May 4 and 7, 2001.  *See* Nepveu Decl. (Dkt. No. 93) Exh. O, at 40-42.

on May 18, 2001 and May 21, 2001, were similarly denied, the first denial

bearing the legend "chronic disciplinary problem pending Tier II" and the

second with the notation "pending Tier III [for] creating disturbance

chronic problem".  Amended Complaint (Dkt. No. 20) Exh. L; Nepveu

Decl. (Dkt. No. 93) Exhs. K & L.

## II.      PROCEDURAL HISTORY

Plaintiff commenced this action on March 6, 2001 and, with

permission from the court, later filed an amended complaint on October

17, 2001.  Dkt. Nos. 1, 20.  Named as defendants in plaintiff's amended

complaint are several DOCS employees assigned to Auburn, including

Corrections Officer V. Hoadley; Corrections Sergeant J. Giannotta;

Corrections Captain Craig Gummerson; Corrections Officer Walter Pelk;

Corrections Lieutenant Rodney Ashby; Corrections Officer L. Vanderwerff;

Corrections Officer (first name unknown) Franczek; Corrections Officer

(first name unknown) Gibson; Corrections Lieutenant (first name

unknown) Quinn; Deputy Superintendent for Security John J. Burns; First

Deputy Superintendent J. Burge; and Hans Walker, Superintendent of the

facility.  *See id.*  Plaintiff's amended complaint asserts claims of unlawful

retaliation; Eighth Amendment violations resulting from certain

9

deprivations experienced by him while under keeplock confinement; and impairment by defendants of the exercise of his protected First Amendment rights, including to freely exercise his chosen religion, based upon defendants' actions in preventing him from attending religious services.  As relief for the constitutional violations alleged, plaintiff seeks recovery of compensatory damages for mental anguish and emotional distress in varying amounts ranging from $200,000 to $500,000 against each of the twelve named defendants.

Following the filing by defendants of a motion initially seeking dismissal of plaintiff's claims for failure to state a cause of action for which relief may be granted, and a later cross-motion in response to plaintiff's summary judgment motion, requesting dismissal as a matter of law of certain of plaintiff's claims, I issued a report and recommendation on May 21, 2003 suggesting dismissal of all of plaintiff's claims with the exception of those related to his religious exercise cause of action.  Dkt. No. 62.  As to that latter claim, I found the existence of genuine, material triable issues of fact precluding the entry of summary judgment based upon the record then before the court, particularly in view of the requirement, when evaluating his First Amendment claims, to evaluate the disputed

encroachment upon plaintiff's free exercise rights in light of the legitimate

penological concerns of the DOCS and its employees.  That report and

recommendation was accepted by order issued by Chief Judge Frederick

J. Scullin, Jr., on January 9, 2004, resulting in dismissal of all plaintiff's

claims with the exception of his First Amendment free exercise cause of

action against defendants Gummerson and Burns.  Dkt. No. 68.

Now that discovery is closed, defendants have renewed their

request for the entry of summary judgment dismissing plaintiff's free

exercise religious claims as a matter of law.  Dkt. No. 93.  In their motion,

defendants argue that plaintiff's First Amendment rights were not violated,

and that in any event they are entitled to qualified immunity.  *Id.*

Defendants also assert that plaintiff has failed to establish the requisite

degree of personal involvement on the part of defendant Burns in the

constitutional violation alleged, and additionally that Gill is not entitled to

recover compensatory damages based upon his failure to plead and

prove the existence of a resulting physical injury, as required under 42

U.S.C. § 1997e(e).  Plaintiff has since responded both in opposition to

defendants' motion, and additionally seeking reconsideration of the court's

earlier determination and reinstatement of his First Amendment retaliation

11

claims.  Dkt. No. 95.

The parties' cross-motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.    Summary Judgment Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also*

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n. 4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553;

13

*Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

### B.   Free Exercise Claims

_____In their motion defendants challenge the legal sufficiency of plaintiff's free exercise claims, taking several angles of attack.  First, defendants question the sincerity of plaintiff's religious beliefs, based principally upon his failure on certain occasions while in keeplock confinement to request permission to attend Jehovah's Witness services. Additionally, defendants urge the court to find, as a matter of law, that the legitimate penological concerns of the facility staff which led to denial of

14

his requests trump plaintiff's right to attend the religious services at issue.

Lastly, defendants seek qualified immunity, asserting that in any event

their actions were not objectively unreasonable in light of the established

case law.

Among the constitutional rights which accompany inmates into

prison facilities, as distinct from those shed at the prison door, is the right

under the First Amendment to freely exercise a chosen religion.  *See Pell*

*v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974); *Ford v.*

*McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell*).  The right

enjoyed by prison inmates to the free exercise of their religion, however, is

not limitless, but instead is circumscribed by considerations of "'the

interests of prison officials charged with duties arising from administration

of the penal system.'"  *Ford*, 352 F.3d at 588 (quoting *Benjamin v.*

*Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.

Ct. 372 (1990)); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348,

107 S. Ct. 2400, 2404 (1987).

Among those guaranteed to prisoners under the First Amendment's

free exercise clause is the right to participate in congregate religious

services, subject to the limitations imposed by valid penological concerns

including those relating to institutional security.  *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993).  To establish a constitutionally cognizable First Amendment free exercise deprivation, a prison inmate must establish 1) the existence of sincerely held religious beliefs; 2) a substantial burden on the exercise of those beliefs; and 3) that the action taken to thwart the exercise of those rights was not reasonably related to legitimate penological interests.  *Ford*, 352 F.3d at 588-96.  The safety and security of a prison is a legitimate penological objective.  *Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995).  The determination of whether a refusal to permit attendance at a religious service impinges upon an inmate's First Amendment free exercise right under this test is "one of reasonableness, taking into account whether the particular [act] affecting [the] right . . . is 'reasonably related to legitimate penological interests.'"  *Benjamin*, 905 F.2d at 574 (quoting *Turner v. Safley*, 482 U.S. 78, 89, 109 S. Ct. 2254, 2261 (1987)).  In applying this test of reasonableness, a court must accord deference to prison official's decisions in connection with affairs involving prison administration.  *Turner*, 482 U.S. at 89-90, 107 S. Ct. at 2261-62.

The genesis of plaintiff's free exercise claim is defendants' denial of

his requests to attend congregate Jehovah's Witness services on several occasions while in keeplock confinement.  It is well established that "[c]onfinement in keeplock does not deprive prisoners of [the right to participate in congregate religious services]."  *Salahuddin*, 993 F.2d at 308.  Consistent with the balancing test applied to measure the constitutional validity of the denial of a religious service request, however, the right of an inmate on disciplinary restriction to attend religious services may be withheld or limited if the restriction is reasonably related to legitimate penological interests.  *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S. Ct. 3224 (1989).

The record establishes that plaintiff's various requests for permission to attend at Jehovah's Witness services while in keeplock confinement were reviewed pursuant to DOCS Directive No. 4202. According to Corrections Captain Gummerson, each such request was considered on its own merits, taking into account various relevant factors including the safety of inmates, staff and visitors as well as general security of the facility.  Gummerson Decl. (Dkt. No. 93) ¶ 6.

Based upon the record, it appears that those of plaintiff's requests which were considered by defendant Gummerson were denied in part due

17

to the circumstances which precipitated plaintiff's keeplock confinement, which included allegations of plaintiff's harassment, refusal to obey orders and creating disturbances, as well as plaintiff's disciplinary history in general.  Given plaintiff's long history of disciplinary infractions and the nature of the violations for which he was under keeplock confinement, and coupled with the opportunity for plaintiff to pray and study the Bible and other relevant materials in his cell as an alternative means of exercising his chosen religion, I find that plaintiff has failed to establish that the denial of his requests was not based on legitimate penological concerns which override his limited right to participate in congregate religious services.[10]  *Gill v. Tuttle*, No. 00-CV-585, Dkt. No. 54, at 15-16 (N.D.N.Y. 2002) (Hurd, D.J. & Homer, M.J.).

C.   Personal Involvement

In addition to seeking dismissal of plaintiff's religious free exercise claims on the merits, defendants assert that in any event plaintiff has failed to establish a basis for liability on the part of Deputy Superintendent

---

[10]   In light of this determination I have not addressed the sincerity of plaintiff's religious views, an alternative argument raised by defendants as providing a basis for summary dismissal of plaintiff's claims.  I note, however, that in view of the record before the court, at a minimum genuine issues of material fact exist regarding the sincerity of those beliefs.  Similarly, I have not addressed the issue of qualified immunity in light of my recommendation on the merits.  *See Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156 (2001).

18

for Security Burns for First Amendment violation alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor – there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the

19

supervisor may have been grossly negligent in managing the subordinates

who caused the unlawful event; or 5) the supervisor may have failed to act

on information indicating that unconstitutional acts were occurring.

*Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*,

781 F.2d 319, 323-24 (2d Cir. 1986).

The record discloses no indication of defendant Burns' participation

in the decision-making process which led to the denial of plaintiff's various

applications to attend religious services.  To the contrary, the record firmly

establishes that while pursuant to DOCS Directive No. 4202 those

requests were properly directed by Gill to Deputy Superintendent Burns,

they were in turn forwarded to Corrections Captain Gummerson, who was

delegated the authority for reviewing them and deciding whether to grant

or deny the requests.  *See* Gummerson Decl. (Dkt. No. 93) ¶ 5.  These

facts, without evidence of active participation on the part of defendant

Burns in the process, are insufficient to implicate defendant Burns in the

First Amendment violations alleged by Gill.  *Walker v. Pataro*, No.

99CIV.4607, 2002 WL 664040, at *12-*13 (S.D.N.Y. Apr. 23, 2002).  I

therefore recommend dismissal of plaintiff's claims against Deputy

Superintendent Burns as a matter of law on the ground of his lack of

personal involvement.

D.   Plaintiff's Claim for Compensatory Damages

In their motion defendants also seek dismissal of plaintiff's claim for

large sums of compensatory damages for mental anguish and emotional

distress, based upon his failure to allege and plead the existence of

physical injury, as requested under 42 U.S.C. § 1997e(e).

Section 1997e(e), a provision added by the Prison Litigation Reform

Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996),

provides in relevant part that

> [n]o Federal civil action may be brought by a
> prisoner confined in a jail, prison, or other
> correctional facility, for mental or emotional injury
> suffered while in custody without a prior showing of
> physical injury.

42 U.S.C. § 1997e(e).  Section 1997e(e) includes within its purview

alleged constitutional violations.  *Thompson v. Carter*, 284 F.3d 411, 417-

18 (2d Cir. 2002); *Petty v. Goord*, No. 00 Civ.803, 2002 WL 31458240, at

*8-*9 (S.D.N.Y. Nov. 4, 2002).  Claims brought by inmates pursuant to

section 1983 for emotional damages unrelated to any physical injury are

subject to dismissal.  *Shariff v. Coombe*, No. 96 Civ. 3001, 2002 WL

1392164, at *4 (S.D.N.Y. June 26, 2002).  The absence of physical injury

21

does not totally bar claims by inmates under section 1983, however, since section 1997e(e) does not preclude the maintenance of claims for nominal damages, punitive damages, or declaratory or injunctive relief even in the absence of physical injury.  *Id.*, at *5 (citation omitted).

Plaintiff's complaint fails to disclose that he suffered any physical injury as a result of defendants' actions in denying him his right to participate in the congregate religious services at issue.  Consequently, I recommend that this portion of defendants' motion be granted, and plaintiff's claim for compensatory damages for mental anguish and emotional distress be dismissed.[11]

> E.    Reconsideration of Dismissal of Plaintiff's First Amendment Retaliation Claim

In his complaint, as amended, plaintiff alleges that as a result of his having lodged grievances against various corrections workers at Auburn, he suffered recrimination, including being placed on keeplock cell confinement.   Amended Complaint (Dkt. No. 20) ¶¶ 1-6.  Plaintiff also asserts that in response to one grievance he was issued a misbehavior

---

[11]    This ground for dismissal of plaintiff's claim for compensatory damages applies with equal force to plaintiff's retaliation claims, which I am recommending be reinstated.  *See* pp. 22-26, *post.*  Consequently, I will recommend dismissal of plaintiff's claim for compensatory damages for mental anguish and emotional distress in its entirety, including as related to the remaining retaliation claims in the action.

report disciplinary by defendant Hoadley accusing him, *inter alia*, of lying in relation to the grievance.  *Id.* ¶ 7.  Plaintiff further avers that the filing of a written complaint with the Deputy Superintendent of Security on April 9, 2001 resulted in keeplock confinement and the issuance of yet another misbehavior report, accusing him of making false statements.  *Id.* ¶¶ 12-15.  Additionally, Gill alleges that Vanderwerff authored, and Gibson and Franczek endorsed, a misbehavior report in retaliation for his having orally requested the return of his watch, which was taken during a pat frisk.  *Id.* ¶¶ 26-27.

Plaintiff's retaliation claims were the subject of an earlier motion by the defendants seeking, in the alternative, either their dismissal for failure to state a cause of action upon which relief may be granted or, alternatively, summary judgment dismissing them as a matter of law.  In their motion, defendants argued both that the adverse actions allegedly suffered by the plaintiff in retaliation for his protected activity were *de minimis,* and thus not constitutionally significant and, alternatively, that plaintiff could not demonstrate his First Amendment rights were actually chilled by defendants' actions, as evidenced by his continued filing of grievances and lawsuits.

In a report and recommendation to Chief District Judge Frederick J. Scullin, Jr., issued on May 21, 2003, I found that plaintiff's retaliation claims were sufficiently stated to survive Rule 12(b)(6) scrutiny, and that when plaintiff's allegations were construed in a light most favorable to him, the adverse actions alleged by the plaintiff could not be regarded as *de minimis.*  Dkt. No. 62, at 16-20.  After reviewing the record before the court, however, I recommended dismissal of plaintiff's retaliation claims as a matter of law based upon his failure to satisfy the requirement of demonstrate that his First Amendment rights were chilled as a result of defendants' actions.  *Id.*, at 38-39.  That portion of my report and recommendation was adopted on January 9, 2004 by Chief Judge Frederick J. Scullin, who specifically accepted my finding that plaintiff's inability to satisfy the requirement that he was actually deterred from the continued exercise of his First Amendment rights by defendants' retaliatory conduct was fatal to his retaliation claims.  Dkt. No. 68.

Since the issuance of both my report and Chief Judge Scullin's order accepting my recommendation, the Second Circuit issued a decision in *Gill v. Pidlypchak*, clarifying that a prison inmate like the plaintiff alleging a retaliation claim need only demonstrate that the adverse action taken,

viewed objectively, "'would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003)).  In its decision in *Gill,* the Second Circuit specifically rejected importation from other First Amendment arenas, including cases involving private criticism of public officials, *see*, *e.g.*, *Spear v. Town of West Hartford*, 954 F.2d 63 (2d Cir. 1992), into First Amendment retaliation jurisprudence as a whole, finding no parallel requirement in the case of an inmate who has allegedly suffered adverse action as a result of the exercise of protected, First Amendment rights.  *Gill*, 389 F.3d at 380-81.

Plaintiff in this action has sought reconsideration of the court's earlier decision dismissing his retaliation claims, based upon the Second Circuit's subsequent decision in *Gill.*  That case directly undermines the continuing vitality of this court's dismissal of plaintiff's retaliation claims in this action, based upon my recommendation to Chief Judge Scullin. Reconsideration by the court of its earlier decision is therefore both appropriate and warranted, since intervening case law development has clarified that the initial determination is no longer legally supportable.  *See*

25

*Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 256-57 (2d Cir. 1991). In light of the foregoing and the fact that the basis on which plaintiff's retaliation claims were dismissed in this case as a matter of law is no longer valid, I recommend that the court vacate the portion of its earlier order dismissing those claims, direct they be reinstated, and provide defendants an additional opportunity to challenge those claims on any other basis by dispositive motion including, though not limited to, lack of personal involvement.[12]

## IV.   SUMMARY AND RECOMMENDATION

The record now before the court firmly establishes that plaintiff's various requests for permission to attend religious services while on keeplock confinement were carefully considered in accordance with the applicable DOCS directive, taking into account legitimate security concerns at the facility, and were denied based upon those legitimate penological considerations in light of plaintiff's established disciplinary history and the circumstances giving rise to the keeplock confinement during the periods in question, and that those denials were reasonable

---

[12]      In their earlier summary judgment motion defendants argued lack of personal involvement, particularly on behalf of defendant Giannotta who, in an affidavit in support of that motion, denied any role in the issuance of the January, 2001 misbehavior report.  *See* Giannotta Aff. (Dkt. No. 52) ¶¶ 5-6.

under the circumstances.  I therefore recommend that summary judgment be entered dismissing plaintiff's religious deprivation claims.  I also recommend dismissal of plaintiff's religious free exercise claim as against defendant Burns on the additional, independent basis that plaintiff has failed to establish his personal involvement in the violation alleged.  I further recommend that defendants' motion for summary judgment dismissing plaintiff's claim of entitlement to recover compensatory damages for mental anguish and emotional distress be granted, and that claim dismissed, based upon his failure to prove an accompanying physical injury resulting from the acts of which he now complains.

Turning to plaintiff's request for reconsideration, having reviewed the matter in the light of intervening, illuminating case authority, I recommend that the court reconsider its earlier determination to dismiss plaintiff's claims of retaliation for engaging in protected activity under the First Amendment, and that those claims be reinstated against defendants Hoadley, Giannotta, Pelc, Vanderwerff, Gibson and Franczek.  In light of this determination, I also recommend that defendants be given an additional opportunity to file a dispositive motion challenging plaintiff's First Amendment retaliation claims on any basis other than relating to the

27

argument previously accepted, and now rejected, to the effect that plaintiff's retaliation claims lack merit based upon his failure to establish that the exercise of his First Amendment rights was actually chilled as a result of defendants' allegedly retaliatory acts.

Based upon the foregoing, it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's First Amendment free exercise religious claims be GRANTED, and that those claims be DISMISSED; and it is further

RECOMMENDED, that the court's earlier determination dismissing plaintiff's First Amendment retaliation claims be RECONSIDERED, and, upon reconsideration, that those claims be REINSTATED as against defendants Hoadley, Giannotta, Pelc, Vanderwerff, Gibson and Franczek, without prejudice to defendants' right to move for the entry of summary judgment dismissing those claims on other grounds within sixty (60) days of the date of entry of an order in connection with this recommendation.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within TEN days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P.  6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties by regular mail.

Dated:   February 8, 2006
         Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\ISSUES\civil rights\First Amendment\religion\gill4.wpd

29